**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

NEWARK COALITION FOR LOW      :
INCOME HOUSING, et al.      :      Civ. No. 89-1303(DRD)
     :
     Plaintiffs,      :      **O P I N I O N**
     :
     v.      :
     :
NEWARK REDEVELOPMENT AND      :
HOUSING AUTHORITY, and      :
ALPHONSO JACKSON, Secretary      :
of Housing and Urban Development,      :
     :
     Defendants.      :
_____:

Legal Services of New Jersey, Inc.
100 Metroplex Drive, Suite 402
Edison, New Jersey 08818
By:      Harris David, Esq.
         Connie M. Pascale, Esq.
             Attorney for Plaintiffs, Newark Coalition for
             Low income Housing, et al.

Ellen Michelle Harris, Esq.
Chief Legal Officer
400 Broad Street, 6th Floor
Newark, New Jersey 07102
             Attorney for Newark Redevelopment and Housing
             Authority

Christopher J. Christi, Esq.
United States Attorney's Office
970 Broad Street, Suite 700
Newark, New Jersey 07102
By:      Neil R. Gallagher
         Assistant U.S. Attorney
             Attorney for United States Department
             of Housing and Urban Development

**Debevoise, Senior District Court Judge**

On May 24, 2007 the court entered an order requiring that the parties show cause why an order should not be entered to the effect that:

1. The parties shall enter into an agreement setting forth the manner in which NHA shall complete its obligation to construct 1777 townhouses as required by the 1999 Settlement Agreement (the "Townhouse Agreement");

2. Except for the Townhouse Agreement the 1999 Settlement Agreement shall be terminated and no party shall have any further rights or obligations under it;

3. The appointment of the Special Master shall continue until further order of the court and;

4. When the Townhouse Agreement is executed (or, failing the execution of such an agreement when the court signs an order specifying the manner in which NHA shall fulfill its obligation to build 1777 townhouses) this action shall be dismissed with the court reserving jurisdiction to enforce the Townhouse Agreement.

Plaintiffs, Newark Coalition for Low Income Housing, et al., and Defendants, the Newark Housing Authority ("NHA") and the United States Department of Housing and Urban Development ("HUD") submitted papers in support of, and in opposition to, the order to show cause. A hearing was held, and thereafter Plaintiffs and NHA, with the assistance of the Special Master, attempted to reach agreement on the continuing obligations of NHA to Plaintiffs.

Having concluded that, except for the matters set forth in Schedule A to the order implementing this opinion, the court's monitoring of NHA should terminate, the court will enter an order terminating the 1999 Settlement Agreement (except as set forth in a Schedule A to the

order implementing this opinion) and dismissing this case, retaining jurisdiction to enforce the provisions of Schedule A.

## I.  <u>Background</u>

A.  <u>Original Settlement Agreement</u>:  In 1989 plaintiffs instituted this action to compel NHA to perform its obligations under the law and, in particular, to prevent NHA from demolishing approximately 1,506 public housing units constituting all of the buildings at Columbus Homes and three buildings at Kretchmer Homes.  HUD was joined as a defendant.  It was plaintiffs' contention that NHA had a statutory obligation to replace the demolished units on a one-for-one basis, that NHA had neither the ability nor intention to replace the units it proposed to demolish, and that instead of demolishing these units NHA should be ordered to renovate them and make them available for those desperately in need of low income housing.

There was evidence in the record which would support a finding that NHA was incapable of either completing new construction or maintaining its existing housing stock.  There was an inordinately high vacancy level, and NHA was incapable of either reducing that level or preventing it from steadily increasing when units became vacant.

During the spring and summer of 1989, the parties to the proceeding engaged in intensive mediation conducted by Eric R. Max of the State of Office of Dispute Settlement.  The parties ultimately arrived at a Settlement Agreement.  After a hearing, the court approved the Agreement on August 17, 1989.  Pertinent terms of the Agreement were the following:

1.  A plaintiff class was certified which included (a) occupants of Kretchmer Homes between April 1, 1985 and the date of the court approval of the Settlement Agreement, (b) occupants of Columbus Homes between June 1, 1988, and the date of court approval of the

Settlement Agreement, (c) individuals or families who had applied to NHA for admission to NHA's public housing as of the Agreement date and were on NHA's waiting list for public housing at any time after April 1, 1985.

2.  NHA agreed to enter into contracts with one or more private firms to conduct studies to evaluate the preventive and ongoing maintenance, security, long term viability and feasibility and costs of rehabilitating all of NHA's public housing projects, except those which could be demolished under the terms of the Agreement.  Based upon the studies, NHA was to propose a comprehensive plan for the modernization and rehabilitation of all of NHA's public housing projects that NHA found to be feasible to rehabilitate and which had long term viability as public housing after completion of rehabilitation.

3.  The Agreement provided for the phased demolition of Columbus Homes.  The object of the phasing was to ensure that NHA would meet its one-for-one replacement obligation. Buildings 5, 6, 7 and 8 would be demolished after construction contracts were entered into and notices to proceed issued with respect to 465 units.  Buildings 3 and 4 would be demolished after construction contracts were entered into and notice to proceed issued with respect to 194 additional units and after NHA had acquired land and obtained HUD approval of sites sufficient to construct 728 additional replacement housing units.  Thus it was contemplated that NHA would provide for the construction of 1,777 new housing units in exchange for the demolition of the 1,506 Columbus Homes units.

4.  NHA agreed to file an application for court approval of a replacement schedule for completion of the 1,506 replacement housing units for Columbus Homes.  It agreed that NHA would construct not less than 300 public housing units on the Columbus Homes site.

4

5.  The Settlement Agreement provided for a vacancy repair program.  Beginning with the second month after approval of the Agreement NHA was obligated to complete the repair and occupancy of 136 vacant housing units each month for a consecutive 12 month period.  After 1,632 vacant units were occupied, NHA became obligated to complete the repair and occupancy of at least 68 vacant units per month until substantially all housing units requiring moderate repair were occupied.  "Moderate repair" was defined to mean repairs for which the estimated costs of labor and materials did not exceed $3,000.

6.  NHA agreed to enter into contracts for specified repairs at Kretchmer Homes.  Conditions were specified for the demolition of Buildings 3, 4 and 5 at Kretchmer Homes, namely, (a) NHA would have completed repair and occupancy of the 1,632 vacant units referred to above or one year from the approval of the Agreement had elapsed, whichever was later, and (b) NHA had completed the Kretchmer Homes repairs.

B.  Enforcement of Settlement Agreement:  Sad to relate, although the Settlement Agreement on its face provided for great advancement in public housing in Newark, NHA proved utterly unable to implement its provisions.  Construction of new units lagged woefully; repair and occupancy of vacant units were not accomplished; NHA did not approach meeting the conditions imposed for the demolition of Columbus Homes.  It appeared that the management was simply not able to perform its responsibilities.

In 1992 two events occurred which changed the picture.  Mr. Harold Lucas was appointed Executive Director of NHA, leading gradually to the creation of a new and more effective top management of NHA.  In August 1992 plaintiffs filed a well documented application to place NHA in receivership in order to enforce the Settlement Agreement.  The receivership proceeding

laid bare the disastrous state of NHA.

Rather than appointing a receiver, the court held a series of hearings to attempt to deal with the most critical breaches of the Settlement Agreement.  The first issue was the lag in construction of new units.  In a series of so-called "Implementing Orders," schedules for completion of the various construction projects were established and, when necessary, modified. Substantial progress was made in the commencement and completion of new housing units.  This is in marked contrast to the situation for more than a decade prior to 1992 when NHA was incapable of completing any new construction.  Sufficient progress was made so that in the spring of 1994 the first phase of the Columbus Homes demolition could take place.

The most intractable problem turned out to be the repair and occupancy of the huge backlog of vacant units and the repair and occupancy of units which became vacant, so-called "Attrition Units".  This situation was a major concern of HUD, and in a 1993 Memorandum of Agreement ("MOA") with HUD, NHA agreed to an ambitious program of returning to occupancy both 1,158 long term vacant units and units which became vacant through attrition. The MOA was incorporated in Implementing Order No. 3 dated February 18, 1993.  The Implementing Order imposed a number of substantial obligations upon NHA, including;

1.  NHA undertook to meet quarterly goals with respect to both long term vacancies and Attrition Units, which included repairs and occupancy of units in Hayes Homes and Kretchmer Homes.  After December 31, 1993 NHA was to repair and occupy Attrition Units within 30 days from the date they became vacant.

2.  NHA undertook to spend $30 million in modernization funds and to obligate $48 million in modernization funds during the 12 month MOA period.

6

3.  Detailed reporting requirements were imposed on NHA both as to long term vacancies and Attrition Units.

Although NHA's construction program proceeded relatively well, its repair and occupancy accomplishments were nil.  During the first half of 1993 it made no progress in reducing long term vacancies, and it was unable to handle repair and occupancy of Attrition Units.  Consequently, on August 25, 1993 the court appointed Mr. Gustav Heningburg Special Master to review NHA's current practices and propose a plan for bringing NHA into compliance with Implementing Order No. 3 and the MOA.

The Special Master reviewed NHA's administrative practices; he met with the parties and it soon developed that no single plan could address adequately NHA's problems.  Rather it would be necessary to address a multitude of interrelated problems on a continuing basis.  The Special Master's responsibilities were modified accordingly.

Working with the parties the Special Master was able to achieve agreement on a Tenant Selection and Assignment Plan ("TSAP").

He next addressed the apparently intractable repair and occupancy problem.  After considerable investigation and negotiation there were developed procedures which it was hoped would be effective to provide for the repair and occupancy of both long term and Attrition Unit vacancies.  These procedures included the hiring of an outside construction manager to evaluate the condition of vacant units, prepare bid packages for contractors to bid upon and to supervise construction.  The procedures included advance purchase of equipment to be installed in vacant units, reorganizing construction crews and schedules, having tenants selected to occupy units upon completion of repair.

     C. <u>First Amended Settlement Agreement</u>:  However, during the period when the Special Master was working with the parties to solve the repair and occupancy problem, a fundamental question arose which gave rise to a motion for injunctive relief.

     Both HUD and NHA reached a tentative conclusion that three high rise projects, Hayes Homes, Scudder Homes and parts of Kretchmer Homes were in such a deteriorated condition that they could not be economically restored to provide decent, safe and sanitary housing.  Not only were individual units in a state of disrepair, but more fundamentally, the projects' infrastructures of wiring, plumbing, heating and other essential facilities had to be replaced.  This would have required funds which were not available.  According to HUD and NHA, it would have been an egregious waste of funds to repair individual units in these projects and it would have been unfair and perhaps illegal to move tenants into those units which were of such dubious decency, safety and sanitariness.

     However, the terms of both the Settlement Agreement and Implementing Order No. 3, which incorporated the MOA, required repair and occupancy of units in those projects, and, plaintiffs urged, so did the applicable law.

     On November 10, 1993 HUD issued a Vacancy Reduction Assessment Report for NHA. It contained findings and recommendations which, although not definitive, were designed to assist NHA reduce the number of vacant units.  The Report recited that (excluding Columbus Homes) NHA has a total of 10,689 public housing units along with 1,240 Section 8 Existing and Voucher Units.  The public housing was located in 25 project communities, of which 16 were for non-elderly (7,737 units) and nine were for the elderly (2,952 units).  The non-elderly projects were split between high rise and low rise, walk- ups and townhouses.  The elderly communities

were located in high rise buildings.   The Report further recited that 3,251 units in the public

housing program were vacant as of March 31, 1993, i.e., 30.5 percent of the total number.

The Report noted that in 1984 NHA had established a long term goal to eliminate family

high rise projects, having concluded that they were no longer viable as public housing.  The

enactment of federal legislation requiring one-for-one replacement of demolished units and this

lawsuit prevented NHA from pursuing its plan to phase out high rise units.  Some of these units

had retained a greater or lesser degree of viability.  Others had deteriorated badly and no longer

provided decent, safe and sanitary housing.

In February, 1994, NHA prepared a new Vacancy Reduction and Improvement Program.

The Program document noted NHA's failure to meet the requirement of Implementing Order No.

3 and the MOA that it renovate and reoccupy 1,158 long term vacant units during 1993.  It did

not note NHA's abysmal failure to repair and occupy attrition units.  The reason for NHA's

failure to make substantial progress towards meeting the repair and occupancy requirements was

the failure to establish effective administrative procedures.  That was a failure which the Special

Master had been addressing since the date of his appointment, and through his efforts progress

was being made in curing the administrative failures which plagued NHA's repair and occupancy

program.

NHA's Program document noted the HUD Task Force Report and stated that based upon

it and discussions with officials from HUD it "has decided to take Hayes Homes, Scudder Homes

and Kretchmer Homes out of its vacancy repair program for special handling.  These complexes,

due to obsolescence of major systems (e.g. plumbing, electrical, elevators, mechanical and

building envelope, etc.) mandate that special measures be taken to insure the safety and well

9

being of the residents."

The Program document set forth a description of NHA's renovation program for what it called viable units, i.e., those other than Hayes Homes, Scudder Homes and Kretchmer Homes. Both NHA and HUD were in agreement that the abandonment of these three projects, or at least major portions of them, was imperative. That, of course, represented a radical departure from Implementing Order No. 3 and required amendment of that order if the proposal was to be carried out.

The dilemma posed by Hayes Homes, Scudder Homes and Kretchmer Homes was one faced by many housing projects throughout the nation. High rise housing projects had become unmanageable through a combination of social conditions and their physical configuration. These projects had deteriorated to such an extent that enormous sums of money were required to render them decent, safe and sanitary. These sums of money were unavailable. These projects were mostly vacant. The remaining tenants, if any, lived in intolerable conditions. Large sums of money had to be spent to make it possible for the remaining tenants to continue in their units.

Under the then existing statutory one-for-one replacement requirement, housing authorities could not demolish these high rises even though in the long run demolishing them and devoting money to a lesser number of viable units might in the long run have produced a greater amount of decent and sanitary housing. This was so because even though the high rise projects had a large number of units, it was unlikely that these units would have ever become fully habitable.

This program had been brought before Congress and legislation had been proposed to enable housing authorities to demolish non-viable projects without providing new units on a one-

10

for-one basis if specified conditions were met.  This legislation had not yet been enacted.

NHA proposed to utilize such legislation when it became law.  As required by HUD regulations, it had retained independent consultants to determine the viability of Hayes Homes, Scudder Home and Kretchmer Homes.  That enabled it to proceed with a demolition application if the legislation were adopted.

Further, NHA had established repair and occupancy policies in anticipation of being able to demolish all or portions of these three projects.  When tenants in the projects requested a transfer, NHA granted the request, further reducing the occupancy rate.  Plaintiffs contended that in addition to honoring a request to transfer, NHA engaged in tactics designed to pressure tenants to move.  NHA failed to repair and occupy these vacant units, contending it would be heartless and perhaps illegal to move tenants into projects which were in such deplorable condition, and that it was foolish to use limited funds to repair and occupy a unit which might have to be vacated if the demolition program were approved.  Plaintiffs contended that NHA not only failed to repair and occupy vacant units, it also left them unsealed so that they became vandalized and rendered beyond easy repair.

It is this situation which gave rise to a motion on plaintiffs' part to "enjoin NHA's ongoing steps to vacate, deactivate and destroy housing at Hayes, Scudder and Kretchmer Homes."

Plaintiffs noted the desperate need for public housing with more than 7,000 persons on NHA's waiting list and 32,000 homeless or imminently homeless individuals in Essex County. Plaintiffs noted the absence of housing for the homeless, the transitional, the very low and low moderate income families.  In these circumstances, plaintiffs argued NHA and HUD should not

be permitted to eliminate 831 units of housing and close high rise buildings in Hayes, Scudder and Kretchmer Homes.

Plaintiffs contended that NHA's actions violated Implementing Order No. 3, violated the one-for-one provision of 42 U.S.C.§ 1437p(d) and regulations implementing that statute, and violated the annual contributions contract between HUD and NHA.  Further, plaintiffs contended that HUD had an obligation to enforce the provisions of 42 U.S.C. § 1437p(d) and the MOA. Plaintiffs asked for preliminary injunctive relief.

Ruling upon plaintiffs' application for injunctive relief the court held that NHA's actions in contemplation of expected legislation did not violate applicable law or HUD regulations.  The court did find that failure to repair and occupy newly vacant units in the three projects at issue violated Implementing Order No. 3.  That, however, was simply one facet of continuing gross violations of the vacancy and repair provisions of that order, a problem which was being addressed through the office of the Special Master.

The Special Master's review disclosed that there were several reasons for the violation of the order.  One was the serious deficiencies of NHA's administration of the renovation and occupancy program.  Another was the impracticability or impossibility of performance of many requirements of Implementing Order No. 3 and also of the underlying Settlement Agreement in this case.

With the Special Master's assistance, substantial progress had been made in the administration of the repair and occupancy program.  Recognizing that Implementing Order No. 3 and the Settlement Agreement would have to be amended in many respects, the court requested the parties to this action to work with the Special Master in attempting to reach agreement on the

12

necessary revisions.

Pursuant to court directions and with the assistance of the Special Master the parties negotiated an Amended Settlement Agreement which was approved by an order dated July 30, 1996.  Principal terms of the Amended Settlement Agreement were:

1.  The Special Master was assigned oversight responsibility for the Amended Settlement Agreement and initial responsibility to ensure compliance with it.

2.  NHA was still required to build 1,777 units of public housing in accordance with a construction schedule set forth in an Exhibit A to the Amended Settlement Agreement.  NHA was required to provide quarterly reports until the 1,777 units had been completed, detailing the status of all of NHA's public housing construction remaining uncompleted.

3.  Demolition of all Columbus Homes buildings had been completed.  The Amended Settlement Agreement obligated NHA to construct not less than 300 units of public housing on the Columbus Homes site if failure to do so would have the effect of preventing it from complying with the Amended Settlement Agreement.

4.  The Amended Settlement Agreement required repair and reoccupancy of 763 units designated the "Original Vacancy Units" in accordance with a schedule set forth in an exhibit to the Agreement.

5.  The Amended Settlement Agreement also dealt with units that became vacant after September 30, 1994 ("Attrition Units").  Excluded from the provisions governing repair and reoccupancy of Attrition Units were units at the family projects of Hayes, Scudder, Kretchmer, Walsh and Seth Boyden Homes.  There was continued inclusion of Attrition Units in Stella Wright Homes.  NHA obligated itself to "act expeditiously to rent vacant units."  "Attrition Units

13

shall be repaired in accordance with HUD Housing Quality Standards by the end of the month following the month in which the unit first became vacant." The Amended Settlement Agreement further provided that "For purposes of determining compliance with this paragraph: (i) absent unusual circumstances, all units other than efficiency units and one-bedroom units in projects for the elderly shall be rented 20 working days after repairs are completed; (ii) during each six month period NHA's average turnaround record shall be no more than 60 days.

6.  The Amended Settlement Agreement set forth extensive NHA reporting requirements designed to ensure compliance with the Agreement.

7.  Attached to and incorporated in the Amended Settlement Agreement was a detailed TSAP governing the manner in which units were to be rented.

8.  It was provided that at least 40% of all units repaired and occupied pursuant to the Amended Settlement Agreement would be occupied by families on NHA's waiting list for public housing.

9.  By its terms the Amended Settlement Agreement "may be modified only with the written consent of the parties" but that "NHA shall not be obligated to carry out any term or provision . . . if any otherwise applicable state or federal statute(s) or regulation(s) precludes NHA from complying with that term or provision."

After the Amended Settlement Agreement was approved NHA sought to implement its provisions. It fell behind the schedule for construction of new units. Its compliance with the requirements for repair and reoccupancy of both Original Vacancy Units and Attrition Units remained seriously deficient. NHA advanced a number of reasons for its failure to repair and reoccupy these units in a timely manner. One was the difficulty in finding tenants for efficiency

14

units.  Another reason was the circumstances of Stella Wright Homes.  A study which NHA commissioned concluded that staggering capital and other costs required to put Stella Wright Homes in habitable conditions rendered it non-viable.  In the meantime conditions were so bad prospective tenants declined offers of units there and an unusually large number of existing tenants were seeking transfers.

      D.  <u>1999 Settlement Agreement</u>:  Faced with NHA's non-compliance plaintiffs moved to hold it in contempt and to enforce the Amended Settlement Agreement.  NHA moved (i) to amend the schedule for construction of new units, (ii) to excuse its failure to repair and re-rent Original Vacancy Units and Attrition Units, and (iii) to excuse further compliance with the TSAP.  A hearing was held on November 10, 1997 .

      The Special Master reviewed the contentions of the parties and reported on April 15, 1998, that (i) a site plan for construction on the Columbus Homes site had been filed with HUD and its approval was awaited; (ii) the delays in completion of construction of new units were caused by factors beyond the control of NHA; and (iii) NHA had failed to renovate and rent empty apartments in accordance with the schedule established by the Amended Settlement Agreement, and in some instances these failures were the result of a deliberate decision of NHA to defer or terminate renovation efforts.

      On May 22, 1998, an order was entered (i) providing for new construction schedule for new units, (ii) granting NHA's motion to excuse its failure to repair and re-rent Original Vacancy Units, (iii) denying NHA's motion to excuse its failure to repair and re-rent Attrition Units in accordance with the Amended Settlement Agreement and to excuse further compliance with the TSAP.

15

In lieu of a ruling on the contempt application, the order provided for the appointment of an expert in public housing.  Among the assignments of the expert were those set forth in a May 22, 1998 order that provided:

> The court will appoint an expert in public housing to be paid for by NHA.  The expert will, among other things:  (i) review NHA's repair and re-rental procedures for attrition units in light of the Amended Settlement Agreement and TSAP, in light of current HUD regulations and with a view to recommending the most effective means of assuring speedy repair of attrition units and prompt re-renting consistent with HUD regulations, including regulations with respect to non-elderly disabled and elderly persons; (ii) recommend the most effective manner of dealing with Stella Wright Homes and other problem units in the short run and over the long run, taking into account needs of present Stella Wright tenants, the presence of a large tenant waiting list, the physical and social realities of these projects, existing and expected federal and state programs, and reasonably anticipated funding.

It was evident that after the dates of the original Settlement Agreement and the Amended Settlement Agreement there had been major changes in circumstances which threw doubt upon some of the assumptions upon which these Agreements had been based.  Plaintiffs' underlying contention from the outset had been that repair and renovation of the existing public housing stock (including the high rise projects) was the most effective means of providing the greatest number of safe and habitable housing units.  The physical condition of the high rise projects, then social environment and recent legislation and regulations cast serious doubt upon this thesis.

One of the assignments of the court appointed expert was to ascertain the extent to which the Amended Settlement Agreement and the TSAP would have to be amended to reflect changed circumstances.

Pursuant to the May 22, 1998, order the court, upon the recommendation of plaintiffs' attorneys and with the approval of NHA, appointed MaryAnn M. Russ and the firm of Abt Associates, Inc., ("Abt") to perform the studies and make the recommendations specified in the

order.  Abt conducted the studies and submitted five reports.

A Report on Vacancy and Turnaround Problems at the Housing Authority of the City of
Newark ("Vacancy Report") set forth Abt's findings about the reasons for NHA's problems with
vacancy and turnaround times and set forth recommendations about how the time required to turn
over vacant units could be reduced.  Stella Wright was treated as a special problem.  With respect
to other projects Abt ascertained that a principal cause of turnaround delay was a serious lack of
intra-agency coordination among housing management, maintenance teams and rental people.
Other serious administrative deficiencies were identified.  Further, procedures and methods were
excessively complex and overspecialized and others were being ignored.

Abt found an average turnaround time for a vacant unit to be 105 days, far higher than the
Settlement Agreement's requirement of 30 days.  Its report described in meticulous detail the
delay-causing deficiencies which existed at each stage of the turnaround process.

In addition Abt found that NHA's Admissions and Occupancy Policy needed a complete
overhaul and that the TSAP contributed to delays and should be revised in a number of respects.

The Vacancy Report was supplement by, and more detailed recommendations are set
forth in, a report entitled Vacancy and Turnaround Problems - Final Recommendations.

Abt submitted a report entitled Admissions and Continued Occupancy Policy.  It
contained a proposed revision of NHA's Admissions and Continued Occupancy Policy.  It also
contained a proposed revised TSAP.

Abt's third report was entitled Report on the Analysis of Vacancies at the Mixed
Population Buildings and Housing Options for People with Disabilities ("Mixed Population
Report").  This report dealt with the special problems which existed at NHA's mixed population

17

projects, i.e., projects which served people who were elderly (62 years or over) and people with disabilities (who may be of any age).  Abt found that Newark's elderly housing market was over built and that housing which competes with NHA's units is superior in every way, thus making it more difficult for NHA to lease to the elderly.  Persons with disabilities had few alternatives. However, NHA's mixed population buildings were less suited for their needs.  Because of the low desirability of these units and federal rules governing offering of units to applicants on the waiting list, NHA was not able to decrease the long turnaround times it experienced at mixed population buildings.  To address this problem Abt suggested site-based waiting lists for these buildings and it preparing an application to HUD to permit this approach.

Abt's Report on the Viability of Stella Wright Homes (the "Stella Wright Report") confirmed that Stella Wright Homes could not be restored to long term use.  Section 202 of the Omnibus Consolidated Reconciliation Act of 1996 required that public housing units be removed from the public housing inventory within five years if public housing costs exceeded the costs of housing vouchers, and if the long term viability of the property could not be achieved through a reasonable revitalization plan.  For Stella Wright to be viable, NHA had to be able to make all the buildings structurally and socially viable for the next twenty years using money that NHA either had on hand or would receive based on then current statutes and funding levels.

Abt conducted a thorough study of all facets of Stella Wright's then circumstances.  It prepared a § 202 cost comparison and calculated that the cost of operating Stella Wright as public housing was $1,192 per unit month compared to the cost of vouchers of $920 per unit month.

NHA had prepared a physical needs assessment ("PNA") for Stella Wright.  Abt analyzed

18

the PNA.  With respect to the Stella Wright revitalization plan, Abt reported that it would not

meet HUD's requirements for a number of reasons:

> The PNA, which had been determined to be essentially accurate in its identification of needed improvements, estimated a total modernization expense of $95,116,905. This amount of money was neither available nor likely to become available.

> Further, based on discussions with NHA staff and Abt's own observations, it appeared likely that work on the site or in the common areas would be quickly vandalized and would require additional investments.

> The work covered by the PNA correctly included the variety of systems and structural work the buildings would need to remain viable for the 20 years HUD requires.

> The property's density was then inappropriate based upon community standards.  At 39 units per acre, the site was denser than other public housing developments and the surrounding community.  It was no accident that all the new construction in which NHA was currently engaged was much lower density townhomes.

> Even rehabilitated, the ability of Stella Wright Homes to achieve and maintain full occupancy and to attract even a few higher income families was questionable, not simply because of the current problems with the development, but also because of the public's clear (and accurate) image of the neighborhood as a high crime area.

> At that time, NHA had neither modernization plans nor funds that cover rehabilitating the Stella Wright development.  NHA had allocated approximately $13 million in CGP monies to the development, but no monies would be spent on the development until a definite plan had been reached for the site.  It noted that even though demolition was the appropriate plan for the site, because of its poor physical condition, capital monies would have to be spent at Stella Wright in order to establish and maintain decent, safe, and sanitary housing for the residents while they remain at the development awaiting relocation.

> In short, Abt concluded that Stella Wright's "future cannot be other than demolition."

Abt recommended that: (i) NHA should seek HUD approval for Stella Wright's demolition and

not move new families into the project; (ii) NHA should compete for a HOPE VI grant which

would fund the demolition and perhaps pay for new housing; (iii) NHA should explore

cooperative housing ventures with private groups; (iv) NHA had to set a demolition schedule, maintain some of the buildings in habitable condition on a temporary basis while tenants are being relocated, and deal with tenants whose behavior contributes to the wretched condition the buildings are in, and (v) NHA should proceed with relocation of present tenants through transfer to other NHA projects and Section 8 certificates.

Abt's final report was entitled Section 8 Market Analysis and Relocation Plan.  It dealt with the problem of relocating 800 to 900 Stella Wright families.  Absent HOPE VI new construction, most of these families would have had to use Section 8 certificates and vouchers enabling them to rent housing in the private market.

Abt found that "[g]enerally, the rental inventory in Newark and surrounding Essex County is adequate for the relocation of the Stella Wright families, although larger units are relatively scarce."  Its report also stated that "[t]raining and counseling of these families is critical to their success in leasing and retaining suitable housing in the private market.  To put forth the level of effort required to accomplish this relocation expeditiously, NHA must expand their in-house counseling staff and/or contract with housing counseling agencies and/or real estate firms in the area to provide some or all of the necessary relocation support services."

The Market Analysis report disclosed that NHA had 1,000 unused Section 8 certificates. Four hundred were awarded for the relocation of families from Hayes, Kretchmer and Walsh Homes but had not yet been used.  Six hundred were awarded for issuance to the waiting list, but had been "reserved" by NHA for future relocation needs.  There was a waste of Section 8 certificates because NHA would have been entitled to apply for additional certificates to accommodate the Stella Wright tenants.

20

The reports were distributed to the parties and a hearing was held on February 26, 1999 at which Ms. MaryAnn M. Russ summarized Abt's findings and conclusions in light of the parties' written comments previously submitted to her.  The parties presented their critiques of the reports.  Plaintiffs accepted the finding that Stella Wright was not viable and would have to be demolished.  They urged adoption of a number of requirements to be imposed upon NHA, including: (i) NHA should immediately solicit bids for the services of a consultant to apply for a HOPE VI grant; (ii) NHA should proceed at that time to award unused Section 8 vouchers; (iii) NHA should move promptly to demolish Stella Wright while Section 8 vouchers were still available; (iv) by the April 28 deadline NHA should apply for welfare work vouchers; (v) NHA should secure the rights of Stella Wright tenants by making transition buildings decent, safe and sanitary and crime free for as long as they are used; (vi) NHA should strengthen its relocation and counseling capabilities.

Plaintiffs agreed with most of the recommended TSAP changes, but contested a few, about which they undertook to consult with Abt.  Plaintiffs asked that there be compensatory treatment of the disabled to make up for the failure to provide them with housing in mixed projects in the past.

The parties were requested to convey to Abt any additional proposals or objections to Abt's recommendations which they might have and to attempt to reach agreement.  Abt was requested to submit to the court its recommendations, noting any remaining areas of disagreement with the parties.

On the basis of Abt's reports, the written comments of the parties, the hearing and the further report of Abt and comments of the parties, the court proposed a draft of order amending

the Amended Settlement Agreement.  This draft was submitted for the parties' comments.  The parties submitted written comments and further addressed the draft order at a hearing held on April 26, 1999.

The court found that by reason of major changes in circumstances amendments of the Amended Settlement Agreement approved by order dated July 30, 1996 and its accompanying Tenant Selection and Assignment Plan ("TSAP") were required.  On May 25, 1999 it entered an order providing that the 1999 Settlement Agreement and its exhibits attached to the order would be the agreement between the parties, replacing prior agreements and enforceable upon application to the court.

The 1999 Settlement Agreement is now in effect and is the subject of the present order to show cause.  Its principal terms are:

1.  NHA would apply to demolish Stella Wright Homes ("SWH") and in order to secure one-for-one replacement of housing units lost by reason of the demolition of SWH, it would (i) apply to HUD for a HOPE VI project construction grant and (ii) apply to HUD for Section 8 vouchers to relocate SWH tenants.  Provision was made for accommodating SWH tenants during the period while they were securing new homes.  (Article II).

2.  To cure its failure to repair and re-rent attrition units in a timely manner NHA undertook to (i) adopt the Admissions and Continued Occupancy Policy recommended by Abt and the TSAP attached to the Agreement; (ii) proceed to cure the administrative and management deficiencies noted in the Abt reports; and (iii) take steps to make available to persons on its waiting list Section 8 vouchers that NHA had obtained from HUD.  (Article III. A).

3.  NHA was required to retain Abt for the purposes of: (i) supporting NHA's demolition

and relocation at SWH; (ii) assisting with the preparation of an application for a HOPE VI grant; (iii) assisting with the curing of the administrative and management deficiencies in the vacancy and turnaround program; (iv) assisting in implementation of repair and occupancy reorganization; (v) assisting NHA utilize the Section 8 vouchers that HUD had awarded to it but which NHA had not made available to tenants or persons on the waiting list; (vi) monitoring NHA's progress and reporting periodically to the court concerning NHA's compliance with the matters as to which the consultant was to provide assistance.  (Article III.B).

4.  To effect enforcement of the 1999 Agreement (i) the Special Master was given oversight of the Agreement and initial responsibility to ensure compliance; (ii) the parties were, in effect, to bring compliance problems to the Special Master, who would meet with them and, if any party remained dissatisfied, the Special Master would report to the court; (iii) any dissatisfied party could apply to the court for relief; (iv) provision was made for application to the court if NHA failed to adhere to the construction schedule or if NHA required modification of the schedule on account of delays caused by events beyond its control.  (Article IV).

5.  With respect to construction of replacement housing: (i) NHA's obligation to construct 1,777 units continued in accordance with a specified construction schedule; quarterly reports being required; (ii) detailed provisions governed NHA's obligations with respect to the Columbus Homes land and construction of 300 units of public housing on that site.  (Article V.A).

6.  The 1999 Settlement Agreement contained detailed provisions governing NHA's repair and occupancy of units that became vacant after September 30, 1994 ("Attrition Units"). The Agreement provided, among other things, that: "For the purposes of determining compliance

23

with this paragraph: (i) absent unusual circumstances, all units other than efficiency units and one-unit bedrooms units in projects for the elderly shall be rented 20 working days after repairs are completed; (ii) during each six month period NHA's average turnaround record shall be no more than 60 days."   (Article V. B. 1).

7.  NHA was obligated to provide monthly reports to Abt and quarterly reports to the parties, including Cumulative Attrition Reports, Housing Status Reports (Move Ins), Housing Status Reports (Move Outs), Housing Status Reports (Transfers), Housing Status Reports (Vacant Units) for all projects.  (Article V B.2.).

8.  There were provisions concerning Kretchmer Homes which are no longer relevant. (Article V.B.3.).

9.  The 1999 Agreement provided for dismissal of this action and, thereby, its own termination:

E.  NHA's obligation to report concerning the status of its vacancy repair program and to ensure the furnishing of quarterly reports of Abt Associates, Inc., shall terminate, and this action shall be dismissed upon the occurrence of the following events:

1.  The "Columbus Homes Replacement Housing" (the 1,777 units covered by the original 1989 Settlement Agreement) shall have been completed and occupied.

2.  Abt Associates, Inc., shall have certified that NHA has complied with the provisions of paragraphs II.A., II.B. and III.A. of this Agreement except to the extent that compliance is precluded by applicable statute or regulation or is impractical or impossible in the light of prevailing circumstances.  If Abt Associates, Inc., certifies that compliance is impractical or impossible it shall set forth the reasons why compliance is impractical or impossible.  (Article VI E).

After entry of the May 25, 1999 order directing that the 1999 Settlement Agreement and its Exhibits would be the agreement between the parties, the parties commenced implementing its provisions.  NHA, under the leadership of Robert Graham, and Abt worked closely and

24

continuously to implement the administrative procedures that Abt recommended.  Although the ultimate objectives with respect to Attrition Units were not reached, substantial and continuing progress was being made.  Abt monitored NHA's performance and reported periodically to the court, as required by the 1999 Agreement.  Hearings were held at which Plaintiffs and others were able to question Abt's representatives and NHA's Director or other officials and to challenge NHA concerning perceived deficiencies that Plaintiffs contended were not caused by events outside the control of NHA.

Further progress towards completion of the 1777 housing units continued.  Delays in construction of certain projects were caused by contractor defaults or other circumstances that NHA could not control.

Most fortunately, HUD approved NHA's application for a HOPE VI grant, which enabled NHA to proceed with a comprehensive, multi-faceted development project.  NHA Director Robert Graham assigned an experienced housing expert, Karen Torian, to administer the HOPE VI project.  It moved forward in a highly satisfactory manner.

An issue arose concerning the status of Mount Pleasant Estates townhouse units.  NHA had sold certain of these units to their owners pursuant to an NHA home ownership plan that HUD had approved.  Plaintiffs challenged these sales, contending that units sold pursuant to the home ownership plan could no longer qualify as units satisfying the 1777 housing unit requirement of the 1999 Settlement Agreement.

After briefing and argument the court held that there was no necessity to determine whether the home ownership plan violated applicable statutes and regulations, but concluded that the sales of those units disqualified them from being considered replacement housing which

NHA was obligated to construct pursuant to the 1999 Settlement Agreement.  An order implementing this ruling was entered on January 21, 2005.

As recited above, with Abt's continuing advice and monitoring, with the Special Master's involvement as needed, and with the positive commitment of NHA's then Executive Director, Robert Graham, great progress was made after the adoption of the 1999 Settlement Agreement.

By 2002 substantially all of the obligations imposed upon NHA except the continuing obligations under Article V A (construction of 1777 new housing units) and Article V B (repair and occupancy of Attrition Units) had been complied with.

E.  Deterioration and Recovery at NHA: The record does not contain information about the circumstances of the 2002 replacement of Ms. Graham with a new Executive Director. Suffice it to say, this was the end result of the then political processes of the City of Newark. The results, however, were negative, not only for implementation of the 1999 Settlement Agreement but also for NHA's operations generally.  Abt submitted reports in early 2005 that disclosed serious non-compliance with the goals of the Agreement.  HUD's evaluations of NHA's over-all operations were devastating.  They are summarized in the Declaration of Diane J. Johnson that HUD submitted in support of the pending order to show cause.

Ms. Johnson is the Director of HUD's Newark Field Office.  She is responsible for ensuring the effective and efficient administration of HUD programs for the State of New Jersey. HUD provides funds to NHA, as a public housing agency, under the U.S. Housing Act of 1937, as amended, 42 U.S.C. § 1437, et seq. (the "Act"), for the routine expenses of operating and managing public housing developments, as well as for capital improvements to those developments and related expenses.  In exchange for these funds, NHA agrees to regulatory

oversight by HUD.

HUD evaluates public housing agencies by using a scoring system known as the Public Housing Assessment System (PHAS). The regulations implementing PHAS are codified at 24 CFR part 902. Under PHAS, public housing agencies are evaluated and assigned a score based on four indicators, including physical condition, financial condition, management operations, and resident service and satisfaction. A public housing agency that receives an overall PHAS score of less than 60 points (out of a possible 100 points), or less than 60 percent of the total points on any one of either the physical condition, financial condition, or management operations indicator, is designated as a troubled performer or substandard with respect to the indicator for which it received less than 60 percent of the points available. PHAs that are designated as troubled are referred to the Recovery Prevention Corps (RPC) for monitoring and oversight.

In July 2005, RPC conducted an extensive review of NHA's FYE 3/31/04 Public Housing and Section 8 Programs. Based on the results of the review, the NHA received a PHAS overall score of 35 and was designated as "Troubled".

As a Troubled public housing agency, the NHA entered into a binding contractual agreement designated as a Memorandum of Agreement (MOA)/Corrective Action Plan (CAP) with HUD for the purpose of improving the PHAS score to 60 percent or above. The MOA governs all day-to-day operations and contains performance targets on a range of operational areas, strategies to attain designated targets, a public housing agency's commitment to reaching the targets, and incentives to meet performance targets. If the Troubled agency does not meet performance targets within specified timeframes various consequences may be imposed. The MOA also provides for HUD-administered technical assistance to the Troubled agency, and

specifies the involvement of local public and private entities in carrying out the agreement and rectifying the problems.  NHA's Executive Director resigned effective February 10, 2006.

On or about May 26, 2006, in order to ensure the successful implementation and administration of the MOA and CAP, Assistant Secretary of Public and Indian Housing Orlando J. Cabrera delegated to Ms. Johnson the power and authority necessary to fulfill the duties associated with the position of HUD Oversight Administrator for the NHA.  In this capacity she serves as the lead staff person responsible for monitoring and overseeing the NHA MOA and CAP.  Her position entails extensive monitoring of NHA, which includes but is not limited to, receipt of monthly progress reports from NHA detailing the specific actions it is taking to comply with the MOA and overseeing quarterly reviews by HUD of NHA's governance; organization and staffing; financial management and procurement; housing management; property maintenance; resident services and initiatives; capital funds, security, and management information systems.

The court has been furnished with NHA's Memorandum of Agreement Quarterly Progress Report for the Period February 1- April 30, 2007.  It is a two and one-quarter inch thick document that deals with the multitude of subject matters covered by the MOA.  Of significance to the instant case is its coverage of NHA's handling of Attrition Units, a subject of the 1999 Settlement Agreement.

There is an attachment reporting Vacancy Rate and Unit Turnaround.  As to each project and townhouse cluster there are set forth Total Units, Occupied Units, Vacant Units, Units Turned, Average Unit Turnaround (with a target of 20 days).  A "Vacancy Rate & Unit Turnaround Time" section recites: "This indicator examines the vacancy rate, a PHA's progress

28

in reducing vacancies, and unit turnaround time.  Implicit in this [is the] adequacy of the PHA's system to track the duration of vacancies and unit turnaround including down time, make ready time and lease up time."  There is a schedule that sets forth in detail Vacant Unit Turnaround Procedure.

A key development has been the hiring of a new Executive Director.  In June, 2006, NHA recruited Keith D. Kinard.  Previously Mr. Kinard had been the Executive Director of Pittsburgh's Housing Authority.  He had transformed that Authority from troubled status to a nationally recognized high performer.

According to Ms. Johnston, Mr. Kinard is fully committed to NHA's recovery and development.  His leadership has resulted in improvements in governance, organization and staffing.  He has established a working relationship with the City Administration and community stakeholders.

As a result of HUD's increased involvement in the monitoring and oversight of NHA's operations and the arrival of Mr. Kinard, NHA has made marked progress under the MOA and CAP.  In FY 2006 NHA received a PHAS overall score of 74 and was designated a Standard Performer.

As of March 16, 2007 housing units completed pursuant to 1999 Settlement Agreement were as follows:

| Project # | Housing Community | Number of Units |
|-----------|-------------------|-----------------|
| NJ2-39 | Betty Shabazz Village | 124 |
| NJ2-40 | Serenity | 100 |
| NJ2-41 | Oscar Miles Village | 199 |

| NJ2-42 | Kemsco | 194 |
|---|---|---|
| NJ2-43 | Bellemead | 100 |
| NJ2-44 | Rosario Villa | 94 |
| NJ2-45 | Claremont | 100 |
| NJ2-46 | Bellemead | 96 |
| NJ2-47 | Clinton Avenue Townhouses | 100 |
| NJ2-48 | Century 21 | 96 |
| NJ2-50 | The Townhomes at Northpoint and South point | 88 |
| NJ2-52 | Wynona Lipman Gardens | 300 |
| | TOTAL NUMBER OF UNITS | 1591 |

Hosing units in development were as follows:

PROJECT NUMBER:              NJ2-49
NUMBER OF UNITS:             88
DEVELOPER:                   CLAREMONT CONSTRUCTION
LOCATION:                    South Twelfth St., Peshine Avenue, Jelliff Avenue,
                             Hunterdon Street, and Clinton Avenue

| PROPOSED DEVELOPMENT SCHEDULE | | |
|---|---|---|
| **STAGE** | **PROPOSED DATE** | **ACTUAL DATE** |
| Promulgation of RFP | 11/2/06 | 10/31/06 |
| Receipt of Proposals | 1/31/07 | 12/1/06 |
| Developer Designation | 3/2/07 | 2/22/07 |
| Execution of Turnkey Contract of Sale | 9/30/07 | N/A |
| Construction Start | 10/15/07 | N/A |
| Construction Completion | 11/15/08 | N/A |

PROJECT NUMBER:              NJ2-53
NUMBER OF UNITS:             56
DEVELOPER:                   TONY GOMES CONSTRUCTION CO., INC.
LOCATION:                    Elizabeth Avenue and a block between Hillside Avenue
                             and Irvine Turner Boulevard
STATUS:                      Completion is expected to take place in August, 2007

| SUMMARY OF DEVELOPMENT STATUS | | |
|---|---|---|
| Completed Units | - 0- | - 0- |
| Units Under Construction | 56 | 38% |
| Units Awaiting Turnkey Contract | 88 | 62% |
| | | 100% |
| | | |

Construction of Project Number NJ2-49 is proceeding generally on schedule.  However,

31

with respect to Project NJ2-53, which was well on its way to completion, substantial controversies have developed between NHA and the contractor, and final completion and occupation has been delayed.

      F.  <u>Response to Order to Show Cause</u>:  At the court's request the parties met with the Special Master in an effort to reach a consensus on the terms of a short agreement concerning NHA's completion of the construction of 1777 housing units as required by the 1999 Settlement Agreement and as to any other undertakings of NHA which should remain enforceable by court order.  It was the court's expectation that in view of HUD's extensive monitoring and the presence of an able Executive Director, the 1999 Settlement Agreement should be terminated and this ancient case dismissed, with the court retaining jurisdiction to enforce only the new unit construction obligation and perhaps relatively few terms which the parties might agree upon.

      Plaintiffs' counsel, Legal Services of New Jersey ("Legal Services"), demanded that NHA produce extensive documentation.  The extensiveness of the demand suggested that Legal Services was firmly convinced that Plaintiffs (through Legal Services) should continue to monitor NHA as heretofore, and also that new areas of NHA's continuing development should be brought under the court's supervision.

      The requested documentation covered such subjects as NHA's hiring of outside contractors to lease up the senior scattered site housing; plans for each of the family low-rise projects; NHA's plans with respect to Baxter Terrace, including the number of new units and the number that will be public housing; relocation plans for Baxter Terrace and low rise projects; asset management reports on family low-rise units; plans of NHA as to spending on the family low-rise projects the Comprehensive Grant funds allocated for repairs for the family low-rise

units in 2006 and 2007; and NHA's plans for administering the Section 8 program and hiring a full time director.

The court is unaware of the other subjects that Legal Services seeks to bring within the court's orbit. The negotiation process seemed to be dragging on interminably, and on December 5, 2007, the court requested that by December 14 NHA's counsel and Legal Services submit to it the terms to which agreement had been reached and the matters as to which there was disagreement. Neither party responded to the request. Instead, on December 11 Legal Services sent to the Special Master another detailed list of documents it sought from NHA, expressing an understanding that negotiations would continue into January. This further suggests Legal Services's desire to maintain and expand the court's role in the management of NHA.

The court would prefer to have had available to it the precise agreements and disagreements of the parties, but absent that, it will proceed on the basis of the parties' positions expressed in response to the May 24, 2007 order to show cause.

At this point it would be appropriate to acknowledge the extraordinary role that Plaintiffs' counsel, Legal Services, and particularly its attorney principally in charge of this case, Harris David, Esq., have played in the transformation of NHA since 1989, when this action was commenced. At that time a number of legal services and civil rights organizations appeared on behalf of Plaintiffs. NHA was in a catastrophic state. Its housing stock consisted largely of mismanaged and badly deteriorated high rise structures. NHA had already demolished some of these high rise units but was proving utterly incapable of meeting its legal obligation to construct replacement housing on a one-for-one basis. It was proposing to demolish thousands more units with no assurance that it could replace them. Meanwhile NHA was unable to repair and re-rent

33

in a timely manner units that became vacant.  Units that were vacated were frequently
vandalized, rendering them unfit for use, and NHA was deficient in securing and repairing them.

Plaintiffs stepped into this mess by means of the 1989 legal action.  Although many
attorneys appeared on their behalf at the outset, it was primarily Mr. David and Legal Services
who took over Plaintiffs' legal representation in the eighteen years that followed.  They became
experts in the intricacies of HUD statutory and regulatory rules; they pursued NHA relentlessly to
ascertain the status of new construction and renovation and re-leasing of vacated units.  They
moved aggressively to secure enforcement of the Original Settlement Agreement and its
subsequent amendments.  It was in consequence of their motions that the various Implementing
Order were entered, a Special Master appointed and Abt retained to provide invaluable assistance
to NHA as it addressed the administrative problems involved in restoring and re-leasing vacated
apartments.

The description of the history of this case in the preceding portions of this opinion only
suggests the extent of the efforts that Legal Services and Mr. David devoted to this case.
Fortunately, with the exception of the period immediately preceding Mr. Kinard's appointment as
Executive Director, NHA's management worked with the Special Master, Abt and Plaintiffs'
attorneys to achieve the goals of the Settlement Agreements.  While problems remain, and
always will remain, the results of the totality of these efforts can be seen by comparing the status
of NHA's housing and the status of its Attrition Unit programs with those that prevailed in 1989.
The alternative to the prosecution of this law suit would undoubtedly have been a HUD
mandated receivership, which could not possibly have achieved the results that NHA has now
achieved through the dynamics of this lawsuit.

It is understandable that in these circumstances Plaintiffs and their attorneys strenuously contend that the order to show cause be vacated and that the 1999 Agreement remain in effect or that, at least, Plaintiffs, through the court, continue to monitor and enforce Attrition Unit and other requirements.

It is possible with the extraordinary expertise in public housing law that Legal Services has accumulated and with the single-minded energy and dedication its attorneys have shown, Legal Services might come up with superior short-term and long-range plans than NHA will devise and implement. But that is not the way a public body should be run. Only the most egregious circumstances justified court monitoring of important NHA functions for eighteen years. The Court concludes that in view of the changed circumstances and the inappropriateness of the court monitoring indefinitely a competently managed agency in areas that are subject to the regulation and active monitoring of a federal administrative agency, the 1999 Settlement Agreement should be terminated except only as to the construction of the 1777 housing units that were at the heart of the original settlement in 1989 and a few definitive provisions of the 1999 Settlement Agreement.

## II. Discussion

NHA and HUD support the changes in the 1999 Settlement Agreement suggested in the order to show cause, citing the dramatic improvement in NHA's management capabilities, HUD's aggressive monitoring of NHA's management and operations, and continuing changing circumstances affecting the requirements of the 1999 Settlement Agreement and the overall needs and programs of NHA. Other than the requirement to complete the 1777 replacement housing units, the only significant remaining requirements of the 1999 Settlement Agreement

relate to vacant unit turnaround - the timely restoration and re-leasing of vacated housing units.

Plaintiffs, through their counsel, Legal Services, which has so aggressively and effectively prosecuted this case since 1989, does not oppose the order to show cause to the extent that it contemplates continuation of the obligation to complete the required number of townhomes, but it vigorously opposes abandonment of the court's role in monitoring vacancy reduction issues, noting the following statistics:

| Year | Vacancies | Turnaround Time |
|------|-----------|-----------------|
| 2004 | 3.13% | 84.86 days |
| 2005 | 4.78% | 136.80 days |
| 2006 | 6.86% | 120.91 days |

March, 2007 - 8%

| Project | November 2004 | March 2007 |
|---------|---------------|------------|
| Seth Boyden Family | 10.15% | 31.61% |
| Pennington Court | 3.52% | 9.69% |
| Baxter Terrace | 4.77% | 20.71% |
| Stephen Crane Village | 1.15% | 4.55% |
| Hyatt Court | 6.56% | 17.08% |
| Felix Fuld Court | 5.21% | 10.13% |
| Terrell Homes | 2.25% | 10.62% |
| Bradley Court | 10.11% | 12.75% |

Apparently the increase in the low rise vacancies, and thus in the overall vacancy rate is caused, at least in part, by NHA's ceasing to rent units in Seth Boyden, Baxter Terrace and Felix Fuld and perhaps other low rise projects. This reflects NHA's conclusion that, because of their

condition, these projects may have to be demolished and replaced.  The overall increase in vacant units also reflects a temporary leadership vacuum that has been remedied.

Legal Services cites the general housing crisis, noting that the New Jersey Department of Community Affairs ("DCA") estimates the State's current unmet affordable housing need to be in excess of 895,000 units, and that the DCA receives three times more applications for housing assistance than there is funding available, and tens of thousands of households are on waiting lists for subsidized units and housing units.

Legal Services further notes that New Jersey is the fourth least affordable state in the country for tenants: a full-time worker in Essex County needs to earn at least $42,000 per year to be able to afford a two-bedroom apartment at the current Fair Market Rent of $1,063.  According to the most recent Occupational Wage Survey data compiled by the New Jersey Department of Labor, half of all private sector jobs in Essex County pay less than $36,880 per year, with a quarter paying below $23,270 annually.

Legal Services advances further reasons why units should not be left vacant.  Increasing vacancies will reduce the amount of operating subsidies NHA will receive from HUD to operate the Authority in succeeding years.  Under current HUD policy the more units that are vacant, the fewer will be the replacement of demolished units with Section 8 vouchers.  Vacant units lead to spiraling deterioration of conditions within those units.

In these circumstances, Legal Services argues, the Attrition Unit sections of the 1999 Settlement Agreement should be continued.  The Agreement provides for a vacancy repair program.  See 1999 Settlement Agreement, Article V.B. pp. 6-10.  It provides in part that NHA will "repair and occupy units on an ongoing basis," Article B.1, and that the NHA "shall act

expeditiously to rent vacant units," Article B.1. b. p. 7.

The 1999 Settlement Agreement provides termination and dismissal of the action upon the occurrence of the following events:

> 1.  The "Columbus Homes Replacement Housing" (the 1,777 units covered by the original 1989 Settlement Agreement) shall have been completed and occupied.
>
> 2.  Abt, Inc. shall have certified that NHA has complied with the provisions of paragraphs II.A, II.B. and II.A. of this Agreement except to the extent that compliance is precluded by applicable statute or regulation or is impractical or impossible in the light of prevailing circumstances.  If Abt Associates, Inc., certifies that compliance is impractical or impossible it shall set forth the reasons why compliance is impractical or impossible.

Legal Services relies primarily upon Rufo v. Inmates of the Suffolk County Jail, 502 U.S. 367 (1992).  The court concludes that, upon analysis, Rufo supports, rather than precludes, the actions suggested in the order to show cause.

In 1971 inmates of the Suffolk County Jail sued the County Sheriff and other State of Massachusetts and local officials in the District Court, alleging that they, as pretrial detainees, were being held under unconstitutional conditions.  The District Court agreed and permanently enjoined the government defendants "(a) from housing at the Charles Street Jail after November 30, 1973 in a cell with another inmate any inmate who is awaiting trial and (b) from housing at the Charles Street Jail after June 30, 1976 any inmate who is awaiting trial."

The problems remained unresolved in 1977, and after proceedings in the District Court, the Court of Appeals ordered that the Jail be closed on October 2, 1978, unless a plan was presented to create a constitutionally adequate facility for pretrial detainees.  After delays that extended seven months after the October 2, 1978, deadline, the District Court entered a consent decree that incorporated an Architectural Program for a new jail.  Among other things, the

38

Architectural Program called for a total of 309 "single occupancy rooms of 70 square feet.  The size of the jail was based on a projected decline in inmate population from 245 male inmates in 1979 to 229.

The Architectural Program projected that construction of the new jail would be completed by 1983, but work on the new facility had not been started by 1984.  During intervening years the prisoner population increased dramatically, and upon application of the parties the District Court modified the decree to provide for a facility with 435 cells, provided that "single cell occupancy is maintained under the design for the facility."  The number of cells was later increased to 453, and construction commenced in 1987.

In July, 1989, while the new jail was still underway the Sheriff moved to modify the consent decree to allow double bunking in 197 cells, thereby raising the capacity of the new jail to 610 detainees.  The Sheriff argued that changes in the law and in fact required modification. The asserted change in the law was the Supreme Court's decision in Bell v. Wolfish, 441 U.S. 520 (1979), decided one week after approval of the consent decree.  It was argued that the effect of that case was to make double bunking constitutional.  The asserted change in fact was the increase in the population of pretrial detainees.

The District Court refused to grant the requested modification, holding that the Sheriff failed to meet the standard of United States v. Swift & Co., 286 U.S. 106, 119 (1932):

> Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned.

The Court of Appeals affirmed.  On certiorari, the Supreme Court held that a consent decree is subject to Fed. R. Civ. P. 60(b).  It held that the District erred when it held that Rule

39

60(b)(5) codified the "grievous wrong" standard of <u>United States v. Swift</u>.  Rather, the Court

emphasize the distinction that <u>Swift</u> itself drew: "This distinction is between restraints that give

protection to rights fully accrued upon facts so nearly permanent as to be substantially

impervious to change, and those that involve the supervision of changing conduct or conditions

and are thus provisional and tentative . . .  The consent is to be read as directed toward events as

they then were.  It was not an abandonment of the right to exact revision in the future, if revision

should become necessary in adaptation to events to be."  286 U.S. at 114-15.

In the present case this distinction is readily apparent.  The obligation to build 1777

replacement units represented "rights fully accrued upon facts so nearly permanent as to be

substantially impervious to change."  The obligations with respect to Attrition Units involved

"the supervision of changing conduct or conditions and are thus provisional and tentative."

The majority Supreme Court opinion emphasized that flexibility was required in these

circumstances:

> There is thus little basis for concluding that Rule 60(b) misread the Swift opinion and intended that modifications of consent decrees in all cases were to be governed by the standard actually applied in Swift.  That Rule, in providing that, on such terms as are just, a party may be relieved from a final judgment or decree where it is no longer equitable that the judgment have prospective application, permits a less stringent, more flexible standard.

> The upsurge in institutional reform litigation since Brown v. Board of Education . . . has made the ability of a district court to modify a decree in response to changed circumstances all the more important.  Because such decrees often remain in place for extended periods of time, the likelihood of significant changes occurring during the life of the decree is increased.  See, e.g. Philadelphia Welfare Rights Organization v. Shapps . . . in which modification of a consent decree was allowed in light of changes in circumstances that were beyond defendants' control and were not contemplated by the court or the parties when the decree was entered.

502 U.S. at 380-81.

The Court stated that ". . . a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree. If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstances.  A party seeking modification of a consent decree may meet its initial burden by showing a significant change either in factual conditions or in law."  Id. at 383-84.

Modification is not limited to situations in which a change in facts was both unforeseen and unforeseeable, although modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree, Id. at 385.  The Court discussed various factors affecting the determination whether there has been a significant change either in factual conditions or in the law.

Once a party has met its burden of establishing either a change in fact or in law warranting modification of a consent decree, the district court must determine whether the proposed modification is suitably tailored to the changed circumstances.  The Court laid out three cautionary instructions: i) a modification must not create or perpetuate a constitutional violation; ii) a proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor; iii) rather the focus should be on whether the proposed modification is tailored to resolve the problems created by the change in circumstances. (Id. at 391-92).

The Court further admonished: "Within these constraints, the public interest and '[c]onsiderations based on the allocation of powers within our federal system,' . . . require that the district court defer to local government administrators, who have the 'primary responsibility

for elucidating, assessing, and solving' the problems of institutional reform to resolve the intricacies of implementing a decree modification." Id. at 392.

The Supreme Court held "that the Swift 'grievous wrong' standard does not apply to requests to modify consent decrees stemming from institutional reform litigation.  Under the flexible standard we adopt today, a party seeking modification of a consent decree must establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstances." Id. at 393.

It is necessary to consider whether the proposed modification of the 1999 Settlement Agreement complies with the detailed criteria set forth in Rufo.

First, it would be useful to set forth the current status of that Agreement.  Part II related to the high rise project known as Stella Wright Homes.  The Agreement provided that NHA would apply to HUD for authority to demolish it and that NHA would apply to HUD for a HOPE VI grant to enable it to undertake a major development project such a grant would make possible. NHA undertook to make provision to relocate Stella Wright tenants.  All that has been accomplished, and a HOPE VI project is well under way.

Part III of the 1999 Settlement Agreement contained administrative provisions.  NHA was obligated to adopt the Admissions and Continued Occupancy Policy recommended by Abt and the TSAP attached to the Agreement as an exhibit.  NHA was required to cure the administrative and management deficiencies noted in Abt's reports listed in the Agreement. NHA was required to take steps necessary to make available to persons on its waiting list Section 8 vouchers that NHA had obtained from HUD.  NHA was obligated to retain Abt to provide support and assistance in numerous matters that the Agreement required NHA to undertake.

42

Those provisions were complied with.

Part IV provided a mechanism for oversight and enforcement of the 1999 Settlement Agreement.  The Special Master was given oversight responsibility and initial responsibility to ensure compliance with the Agreement.  NHA was required to notify the Special Master and the parties if it believed that it would be unable to comply with any provisions of the Agreement, and the parties would then meet with the Special Master and seek to resolve their differences.  Failing such resolution application could be made to the court.  If NHA failed to meet with its construction schedule, the court was empowered to issue appropriate orders.  NHA was not responsible for delays beyond its control.

The parties proceeded in accordance with the provisions of Part IV; there were numerous consultations with the Special Master and occasional court hearings at which resolution of problems was achieved.

Article VA governs the continued construction of the 1777 replacement units.  The construction requirements of the original Settlement Agreement were continued in effect except that the construction schedule was modified.  Provision was made for quarterly construction reports.  Special provisions were made for construction of 300 units on the Columbus Homes site and limitations were placed on the use of the Columbus Homes site prior to construction.  The limitations were observed and the 300 Columbus Homes units have been constructed and occupied.

Construction has proceeded on the 1777 units and is well on the road to completion.

Article VB of the 1999 Settlement Agreement concerns the Vacancy Repair Program.  It modified previous Settlement Agreements.  "Attrition Units" were defined as "any unit that

43

became vacant after September 30, 1994." Previous versions of the Settlement Agreement were modified to exclude from Attrition Units family projects of Hayes, Scudder, Walsh, Stella Wright and Seth Boyden Homes, "provided that each building at Seth Boyden Homes and Seth Boyden Elderly 12-21E shall be included starting in the month after the month in which the modernization or reconfiguration of the units in the building has been completed."

Article VB sets forth detailed provisions with respect to the timing of repairs and rental of vacated units and reporting:

> b.  <u>Time for Repair and Rental of Attrition Units</u> When a unit becomes vacant, it shall be scheduled for repair on the first day of the next month.  A unit is deemed vacant when the NHA has a right to take legal possession.  Attrition Units shall be repaired in accordance with HUD Housing Quality Standards by the end of the month following the month in which the unit first became vacant.  For example, if a unit became vacant on October 29, 1994, the unit would have to be repaired by November 30, 1994.  Similarly, if a unit became vacant on October 2, 1994, the unit would have to be repaired by November 30, 1994.
>
> NHA shall act expeditiously to rent vacant units.  For purposes of this paragraph, a unit is deemed rented when a lease for the unit is signed.  For the purposes of determining compliance with this paragraph: (i) absent unusual circumstances, all units other than efficiency units and one-bedroom units in projects for the elderly shall be rented 20 working days after repairs are completed; (ii) during each six month period NHA's average turnaround record shall be no more than 60 days.
>
> c.  <u>Units with Extraordinary Damage</u> An Attrition Unit which has suffered an extraordinary amount of damage due to extraordinary circumstances, such as fire, shall not be required to be repaired in accordance with the schedule in Section 1.b above.  The NHA shall report to Abt Associates, Inc., about such units, specify the nature of the extraordinary damage for each unit, and the report shall set forth an estimated date for the repair of each unit.
>
> d.  <u>Shortening Time for Repair and Rental</u> The times for repair and rental of attrition units set forth above are outside limits applicable at the time this 1999 Settlement Agreement becomes effective.  It is anticipated that upon compliance with Abt Associates, Inc.'s management and administrative recommendations as required herein, the times for repair and rental of attrition units will be substantially reduced.  NHA shall meet the targets for times to repair and rent

attrition units which Abt Associates, Inc., shall establish from time to time.

2.  Miscellaneous Provisions of the Vacancy Repair Program

    a.  Reporting Requirements

    (i) The NHA shall provide monthly to Abt Associates, Inc., and quarterly to the parties reports as currently provided.  These include: Cumulative Attrition Reports from 10/1/94 on (REP 208 and 208S); Housing Status Report (Move Ins) (REP 20 and 200S); Housing Status Report (Move Outs) (REP 202 and 202S); Housing Status Report (Transfers) (REP 203 and 203S); Housing Status Report (Vacant Units) (REP 203 and 203S) for all projects.

    The term "date vacated" on the Cumulative Attrition Reports shall be the date the NHA has the legal right to take possession of the unit.

    The reports of extraordinary circumstances relating to Attrition Units required by paragraph V.B.1.c. above will be provided to Abt Associates, Inc., by the 20th of the month after the extraordinary circumstances has become apparent.

    (ii) Upon request of plaintiffs' counsel, the NHA will, subject to review and privilege, provide plaintiffs with other documents reasonably necessary to ensure compliance with this Agreement.  If the NHA denies the request, the NHA will provides its reason for the refusal to the plaintiffs and to the Special Master who will decide whether the document should be provided.  The time during which this procedure may be used shall be the time during which the NHA is required to provide reports on vacancies.

    b.  All units pursuant to this Agreement shall be rented in accordance with the TSAP attached as Exhibit A to this Agreement or a separate Branch Brook Manor TSAP.

    c.  For any 12 month period at least 40% of all units repaired and occupied pursuant to this Agreement shall be occupied by families on NHA's waiting list for public housing, except to the extent that such units may be needed to relocate SWH tenants.  If the NHA desires an exemption from this provision, it shall notify the parties and the Special Master, who shall resolve the matter.

    d.  In order to qualify for a transfer a tenant must meet the criteria set forth in the TSAP.

There were provisions concerning Kretchmer Homes that have been complied with.

Article VC required that in December and March NHA submit Abt reports setting forth the extent NHA complied with the requirements of paragraphs IIA, IIB and IIIA of the 1999 Settlement Agreement, the matters as to which NHA remained in non-compliance, and the actions required of NHA to achieve compliance. Abt provided those reports and NHA has complied with the provisions of the paragraphs. As of this time Abt is no longer under contract with NHA and no one performs the functions allocated to it under the 1999 Settlement Agreement.

The parties agree that NHA's obligation under Article VA to construct 1777 replacement units must continue. The obligations imposed on NHA under Articles II, III, IV have been substantially complied with. The question is whether changed conditions permit the termination of NHA's obligations to Plaintiffs under Article VB's Vacancy Repair Program.

When the 1999 Settlement Agreement was adopted the court found that NHA had failed to comply with the provisions of the then applicable Amended Settlement Agreement and accompanying Tenant Selection and Assignment Plan ("TSAP") governing repairs and re-renting of NHA's Attrition Units. The most serious violations were with respect to re-renting units in the high rise complex known as Stella Wright Homes. In the Background section of this opinion and in the court's May 25, 1999, opinion there are described previous actions taken in this lawsuit to address the Attrition Unit problem. In 1999 NHA was under competent management, had secured the services of Abt, and was engaged in vigorous efforts to meet the Attrition Unit requirements imposed by the Amended Settlement Agreement. However, it faced the dilemma caused by the fact that the high rise projects, Stella Wright Homes, Hayes Homes and Kretchmer Homes, had deteriorated to such an extent that they were virtually uninhabitable, and enormous,

46

but unavailable sums of money would be required to render them decent, safe and sanitary.  The 1999 Settlement Agreement was designed to address this situation and impose Attrition Unit requirements that would reflect the changed conditions.

For several years after adoption of the 1999 Settlement Agreement the parties proceeded under it.  NHA with the assistance of Abt obtained a HOPE VI grant and implemented new procedures for repairing and re-renting vacant units.  When Plaintiffs perceived failures to comply with the Attrition Unit requirements they communicated with the Special Master and/or Abt; the problems were either resolved at that level or brought before the court.

This felicitous state of affairs began to unfold in 2002 when, because of the political dynamics of the City of Newark, NHA's capable Executive Director was replaced.  Deterioration commenced at NHA, not only with respect to implementation of the 1999 Settlement Agreement, but generally in the administration of the Authority.  This resulted in HUD's devastating report, described in more detail above, and classification of NHA as "troubled."

Prior to this time it appeared that HUD, a party to these proceedings, relied upon enforcement of the various Settlement Agreements to maintain an effective program to repair and re-rent units that became vacant.  However, after its finding that overall NHA was troubled, it entered into a comprehensive Memorandum of Agreement/Corrective Action Plan with NHA which is now being implemented.  As described above, this MOA addresses in detail Vacancy Rate and Unit Turnaround.  Further, NHA has retained Mr. Kinard, a highly qualified Executive Director who has already raised NHA's PHAS overall score from 35 to 74, moving it from troubled to standard performer.  The election of a new Mayor in the City of Newark and Ms. Johnson's observation that Mr. Kinard "has established a working relationship with the City

Administration and community stakeholders" suggests that effective administration will not be impeded by political interference.

Under Rufo the obligation to construct 1777 replacement units can be characterized as a "right" fully accrued upon facts so nearly permanent as to be substantially impervious to change." This right must be fully preserved, as no change in circumstances justifies modifying it. Similar to this obligation are the protections the TSAP affords persons on the NHA waiting list. On the other hand, the Agreement's provisions concerning Attrition Units "involve the supervision of changing conduct or conditions and are thus provisional and tentative." This is evidenced by the fact that the Original Settlement Agreement had to be amended several times in very substantial ways to adapt to changing conditions affecting renovation and re-renting of units as they became vacant. Continuing change can be anticipated, requiring NHA to adopt new policies and administrative procedures.

At the present time study is under way to determine whether some of the projects should be demolished and replaced. While demolition is planned and executed, there would be a major impact upon the number of unoccupied units and the length of time between a unit becoming vacant and being re-rented. The 1999 Settlement Agreement's Attrition Unit provisions render it a decree that effects institutional reform, dealing with many interrelated NHA administrative matters. In such circumstances "the ability of a district court to modify a decree in response to changed circumstances is all the more important." Rufo, 502 U.S. at 380.

There have been changed factual circumstances as described above which render the provisions regarding the Attrition Units duplicative and unnecessary. Rufo emphasized that in ordinary circumstances consent decrees should not impinge upon duly constituted governmental

48

agencies. "Within these constraints, the public interest and '[c]onsiderations based on the allocations of powers within our federal system,' . . . require that the district court defer to local government administrators . . ." Id. at 392. Similar to deference to State authorities, is deference to duly constituted federal administrative agencies and the local bodies within their purview. Unlike the situation in 1999 and succeeding years, HUD is fully involved in monitoring NHA's vacancy repair and re-renting performance. There are constantly changing statutory, regulatory and policy decisions which impact upon repair and re-renting of vacant units. Unlike the period from 2002 until 2006, NHA has competent leadership and with HUD's active involvement NHA should not have to apply for modification of the 1999 Settlement Agreement each time one or another of the detailed provisions of Article V B of the 1999 Settlement Agreement is affected.

Further, it is evident that the primary responsibilities of NHA and Legal Services are not identical. Legal Services cites the adverse effect modification might have on overall availability of low income housing in New Jersey as a reason not to modify the 1999 Settlement Agreement. It cites facts evidencing the desperate need for such housing in this State and argues that the total amount of such housing would be reduced if NHA does not lease units in anticipation of the demolition of certain low rise projects. However, NHA's and HUD's responsibility is to preserve NHA's long term viability as a public housing authority. That may require reducing, temporarily at least, available units so that demolition can take place. Issues of this kind raise policy considerations about which the public bodies should be able to exercise their judgment without the continuing intrusion of Legal Services and the court.

There was an extended period when NHA required the constraining effect of a consent decree. During this period Legal Services as counsel for Plaintiffs played an invaluable role.

49

Most of the mandates of these decrees have been complied with, and it is the court's conclusion that there is no longer a necessity to continue imposing upon NHA the requirement relating to Attrition Units.  With capable leadership and active HUD involvement, the court is confident that NHA will maintain a satisfactory program to repair and re-rent units as they become vacant.

### III.  Conclusion

An order will be entered vacating the 1999 Settlement Agreement except as incorporated in a schedule to the order implementing this opinion, and dismissing this action.  Accompanying the order will be a schedule setting forth the continuing obligations of NHA with respect to replacement housing and except as to certain protections to be accorded to persons on NHA's waiting list.

December 18, 2007                              _____/s/ **Dickinson R. Debevoise**___
                                              DICKINSON R. DEBEVOISE
                                              U.S.S.D.J.